**UNITED STATES DISTRICT COURT FOR THE**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| STEVEN PLAVIN, on behalf of himself and all others similarly situated, <br><br> Plaintiff, <br><br> vs. <br><br> GROUP HEALTH INCORPORATED, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )    **JURY TRIAL DEMANDED** <br> ) <br> ) <br> ) <br> ) |

Plaintiff Steven Plavin ("Plaintiff"), on behalf of himself and all others similarly situated, for his Complaint against defendant Group Health Incorporated ("GHI"), states as follows:

## NATURE OF THE ACTION

1.  This is a class action brought on behalf of Plaintiff and similarly-situated persons who were enrolled in GHI's Comprehensive Benefit Plan for City of New York employees and retirees (the "GHI Plan") at any time from 2011 to 2015 (the "Class Period"). Plaintiff seeks to represent a class of GHI Plan members (the "CBP Class") seeking redress for a pattern of unfair and deceptive practices by GHI over the course of many years. This unlawful conduct was partially, and prospectively, addressed by an Assurance of Discontinuance entered into with the Attorney General of the State of New York ("NYAG"), which found GHI to have engaged in "repeated violations of Executive Law § 63(12) and General Business Law §§ 349 and 350" and required GHI to rewrite its marketing materials and agree to a variety of forms of prospective relief. In this action, Plaintiff, on behalf of himself and the CBP Class seeks retrospective relief for GHI's misconduct, asserting a claim of unjust enrichment as well as claims pursuant to General Business Law § 349, General Business Law § 350, and Insurance Law § 4226.

1

2.     The GHI Plan is one of 11 health plans that New York City offers to its over 600,000 employees and retirees, and one of only two purported preferred provider organization (PPO) plans that provide "comprehensive coverage" for out-of-network procedures.  The GHI Plan was the only ostensible PPO plan that did not require members to pay additional premiums out-of-pocket. As of 2014, the GHI Plan had approximately 994,500 members inclusive of family members.

3.     GHI is a chronic bad actor in the health insurance marketplace for NYC workers and retirees. The Assurance of Discontinuance referenced above is one of four Assurances of Discontinuance that GHI has entered into with the NYAG since 2010, each of which found GHI to have engaged in unlawful conduct with respect to its administration of the GHI Plan.

4.     At issue in this case is GHI's unlawful scheme to enroll as many NYC employees and retirees in the GHI Plan as possible by falsely depicting the plan as—in contrast to the other plans on offer—a true PPO plan that gave members the "freedom to choose any provider worldwide" with only the mere possibility that reimbursements might be less than the actual fee charged by out-of-network providers.

5.     GHI distributed and caused to be distributed to NYC employees and retirees two documents prior to each year's enrollment period: a Summary Program Description and online Summary of Benefits & Coverage ("SBC").  Both documents depicted a PPO plan that provided extensive coverage for services by non-participating providers. According to these materials, out-of-network reimbursement would be made according to an official-sounding "NYC Non-Participating Provider Schedule of Allowable Charges" that was "updated periodically."  In the SBC, "Your Cost If You Use a Non-Participating Provider" is listed a "0% co-insurance" for numerous medical events, meaning that employees would not be responsible for any share of those

out-of-network costs. Nothing in the two documents indicated that reimbursement rates for virtually every out-of-network service would be a fraction of the actual cost of that service.

6.     To further convey the impression that employees faced little risk of incurring large reimbursement deficits, GHI's Summary Program Descriptions promoted that the GHI Plan included "Catastrophic Coverage" that went into effect in the event that a member's out-of-network expenses exceeded $1,500. If out-of-network expenses crossed this $1,500 threshold, GHI promised to pay "100% of the Catastrophic Allowed Charge as determined by GHI." GHI also offered, for an additional fee, an optional rider (the "Enhanced OON Rider") that provided an "enhanced schedule for certain services [that] increases the reimbursement of the basic program's non-participating provider fee schedule, on average, by 75%."

7.     In reality, the out-of-network coverage promised by GHI was functionally illusory. The NYC Non-Participating Provider Schedule of Allowable Charges (the "Schedule") was not some industry-standard document, but rather a GHI-created schedule that had been left virtually untouched since 1983 and was concealed from NYC employees and retirees. GHI lied to members and prospective members in stating that the Schedule was available for inspection at GHI's offices and further denied access when requested via email and phone.

8.     The reimbursement rates under the Schedule did not come close to reflecting the reasonable and customary costs of such services. Reimbursement rates across all services averaged roughly 23% of actual cost. For some types of services, reimbursement rates were as low as 9% of actual cost. Below are some illustrative examples of reimbursement rates relative to actual costs:

| Procedure | Patient Visit | Maternity Care and Delivery | Hip Replacement |
|---|---|---|---|

| | | | |
|---|---|---|---|
| **Actual cost** | $225.00 | $9,040.00 | $20,099.95 |
| **Reimbursement under Schedule** | $33.36 | $1,379.00 | $3,011.00 |
| **Member's out-of-pocket cost** | $191.64 | 7,661.00 | $17,088.95 |
| **Reimbursement %** | 14.82% | 15.25% | 14.98% |

9.     Rather than a mere possibility that members would be subject to reimbursement shortfalls for out-of-network services, as GHI's materials suggested, it was a virtual certainty that reimbursements would be dramatically less than the actual fees charged by out-of-network providers in all cases and that members who used out-of-network providers would suffer financially devastating consequences. As the NYAG concluded, "GHI's materials do not accurately set forth the potentially wide gap between the out-of-network reimbursement and out-of-network charges, and potentially substantial out-of-pocket amounts for which GHI Plan members will be responsible," and it was deceptive for GHI to "merely suggest that it is only a possibility that members will be required to pay for out of network services"

10.     The promise of Catastrophic Coverage was also a fraud.  Though not disclosed to prospective members at the time, according to GHI, the undefined term "Catastrophic Allowed Charge" means the same thing as "Allowed Charge" does.  So, according to GHI, the Catastrophic Coverage provides for reimbursement of the exact same Allowed Amount set forth in the Schedule that GHI was already required to pay regardless of whether the member was above or below the $1,500 "Catastrophic Coverage" threshold. In other words, the Catastrophic Coverage added literally nothing to the basic coverage, despite being one of six key benefits highlighted on the Summary Program Description.

11. The Enhanced OON Rider was also not what was represented in the Summary Program Descriptions. Though not disclosed in the marketing materials provided to employees and retirees before they made their plan selection, the Enhanced OON Rider enhanced reimbursement amounts for in-patient services only and did not provide any enhanced reimbursements for out-patient services. Out-patient services accounted for 65% of total out-of-network charges during the Class Period.

12. For GHI, this unlawful scheme was lucrative. In 2013 alone, GHI received total premiums in excess of $2 billion, and premiums exceeded total claims by almost $400 million (a 20% margin). After remitting a $212 million rebate to the City, GHI earned over $172 million for administering the GHI Plan that year. But for Plaintiff and the CBP Class—which include active and retired police officers, firefighters, and teachers—the consequences of GHI's scheme were financially ruinous. This complaint seeks relief for them.

## THE PARTIES

13. Plaintiff Steven Plavin ("Plavin") is a resident of Pennsylvania. Mr. Plavin is a retired New York City police officer who has been a member of, and covered by, the GHI-CBP plan since 1984. Mr. Plavin originally signed up for the GHI-CBP plan while a resident of New York. Mr. Plavin has purchased the Enhanced Major Medical Optional Rider since he became a member of the GHI-CBP plan. Mr. Plavin and his wife, daughters, and sons are currently covered by the GHI-CBP plan.

14. Defendant Group Health Incorporated is a not-for-profit corporation organized and existing under the laws of New York and is authorized to operate as an indemnity insurer under Article 43 of the New York Insurance Law. Its principal place of business is located at 55 Water

Street, New York, New York 10041. GHI is a subsidiary of EmblemHealth, Inc., New York State's largest health insurer.

<u>**JURISDICTION AND VENUE**</u>

15.    This Court has jurisdiction over the subject matter of this Complaint because it is a class action arising under the Class Action Fairness Act of 2005 ("CAFA"), which provides federal district courts with original jurisdiction over any class action in which any member of the plaintiff class is a citizen of a state different from any defendant, and in which the matter in controversy exceeds in the aggregate the sum of $5,000,000, exclusive of interest and costs. 28 U.S.C. § 1332(d)(2).

16.    Plaintiff alleges that the total claims of the individual members of the proposed Class in this action are in excess of $5,000,000 in the aggregate, exclusive of interests and costs, as required by 28 U.S.C. § 1332(d)(2), (5).

17.    As set forth above, Plaintiff is a citizen of Pennsylvania and GHI is a citizen of New York. Plaintiff alleges on information and belief that more than two-thirds of all of the members of the proposed Class in the aggregate are citizens of a state other than Pennsylvania, where this action is originally being filed, and that the total number of members of the proposed Class is greater than 100, pursuant to 28 U.S.C. §§ 1332(d)(4)(B), (5)(B).

18.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) because Defendant is subject to this Court's personal jurisdiction; Plavin is a resident of this district and GHI has had sustained contact with this judicial district in connection with the administration of the health plan that is the subject of this Complaint. Venue is also proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in Pennsylvania.

## FACTUAL BACKGROUND

### A.    The Deceptive Marketing of the GHI Plan

19.    The City of New York offers its employees and retirees a choice of health insurance plans as part of their compensation and retirement packages. Individuals and their families are eligible for this City-sponsored health insurance based solely on their employment with the City. The City pays either the entire premium or a large portion of the premium depending upon the plan that employee/retiree chooses. The amount the City contributes to each City worker's health insurance policy is set by NYC Administrative Code § 12-126 and is a fixed dollar amount annually. As an example, in 2012, that amount was $5,312 annually for an individual and $13,791 annually for a family policy. So, when selecting a health benefit plan, NYC employees and retirees are directing compensation to which they are legally entitled to the insurer whose plan they select.

20.    During the Class Period, the GHI Plan was one of 11 health plans that NYC offered it its workers and retirees. The GHI Plan was one of only two PPO plans offered and the only one of those two that did not require the payment of out-of-pocket premiums. Costs being equal, PPO plans are generally preferred by consumers because they provide coverage for services rendered by almost any provider, whether in-network or out-of-network. HMO plans, by contrast, typically provide coverage for only in-network services.

21.    The open enrollment period for NYC workers to select their health plan was October-November of each year during the Class Period. The open enrollment period for retirees was every two years, occurring in even-numbered years.

22.    Prior to the open enrollment period, NYC employees and retirees receive a document called the NYC Summary Program Description, which is prepared by the NYC Office

of Labor Relations and includes the summaries of the health plans offered by NYC. The NYC Office of Labor Relations administers the health insurance program offered to NYC employees and retirees. The information in the Summary Program Description is provided to NYC employees and retirees to help them select health plans. GHI prepared the section describing the GHI Plan that was included in the Summary Program Description. On information and belief, GHI prepared this section in New York. A copy of GHI's section from the Class Period is attached hereto as Exhibit A.

23. GHI also made available on its website a Summary of Benefits & Coverage. On information and belief, GHI created and distributed the SBC in New York. A copy of the 2013 SBC is attached hereto as Exhibit B.

24. The Summary Program Description was the only document distributed to NYC employees and retirees before they made their annual or biennial election of benefits that described the GHI Plan, and the SBC was the only document on GHI's website that summarized the GHI Plan. Prospective members were not provided with any certificate of insurance or schedule of reimbursement rates, and such documents were not available on GHI's (or its parent EmblemHealth's) website at any point during the Class Period. GHI never sent a certificate of insurance or schedule of reimbursement rates to Plaintiff or, upon information and belief, any members of the CBP Class at any time during the Class Period, even after enrollment. Plaintiff and, upon information, members of the CBP Class also never executed any contract with GHI.

25. By promoting itself as a PPO plan providing comprehensive in-network and out-of-network coverage that also did not require the payment of out-of-pocket premiums, the GHI Plan had the highest enrollment of any health plan offered to NYC employees and retirees. As of 2012, 311,880 NYC employees and non-Medicare retirees were enrolled in the GHI Plan, and

membership totaled approximately 994,500 inclusive of family members. From 2011 to 2015, GHI received roughly $2 billion a year in premiums for the GHI Plan and, after rebates to NYC, earned roughly $172 million a year for administering the GHI Plan. All premiums paid by the City to GHI were paid within New York.

26. GHI operates exclusively out of New York. The insurance at issue was and is issued exclusively to NYC employees and retirees pursuant to contracts with the City. GHI maintains a New York employee-specific web portal where members can access information about their insurance (see https://www.emblemhealth.com/Members/City-of-New-York-Employees).

**B.      The Reality of GHI's Out-of-Network Coverage**

27.      During the Class Period, roughly 10% of the total health services received by GHI Plan members were rendered by out-of-network providers.  GHI based the reimbursement for these services on what it called the "NYC Non-Participating Provider Schedule of Allowable Charges," referred to herein as the Schedule. This document was in fact a spreadsheet that GHI created in or around 1983 based on medical procedure rates at the time. Apart from adding new procedures to the Schedule, GHI has not updated the vast majority of the reimbursement amounts in the Schedule since creation—not even to reflect inflation or a CPI-adjustment.  While GHI stated in the Summary Program Description that the Schedule was available for inspection, it was not, and it was not made available to members by any other means.

28.      On information and belief, GHI maintains the Schedule exclusively in New York.

29.      Given that the Schedule had not been updated in two decades, the reimbursement rates were a fraction of actual costs of services during the Class Period. Attached as Exhibit _ is a table showing the submitted charges and amounts paid by GHI for a variety of services. Reimbursement rates across all services averaged roughly 23% of actual cost, leaving members on

the hook for hundreds of millions of dollars. For some types of services, reimbursement rates were as low as 9% of actual cost.

30.     On information and belief, GHI makes out-of-network determinations and processes out-of-network claims exclusively in New York. On information and belief, GHI sends correspondence, including but not limited to out-of-network claim reimbursement decisions, exclusively from New York. On information and belief, GHI also receives correspondence exclusively in New York. For example, when GHI sends a member an Explanation of Benefits, or Health Plan Payment Summary, that describes the amount, if any, GHI will pay for a member's claim, GHI provides the member with a New York return address. When GHI requests additional information regarding a claim from a member, it provides the member with a New York return address for correspondence. On information and belief, GHI also disburses funds to pay providers for member claims from New York.

### C.     Summary of GHI's Deceptive and Unfair Trade Practices

#### (i)     GHI Misled Consumers as to Levels of Reimbursement for Out-of-Network Coverage

31.     The Summary Program Description and SBC promise prospective members "the freedom to choose any provider worldwide."  Reimbursement was to be made pursuant to an official-sounding "NYC Non-Participating Provider Schedule of Allowable Charges" that had been "periodically updated."  GHI advertised "0% co-insurance" for a number of out-of-network service. Further, GHI repeatedly suggested in these documents that it was a mere possibility—not a certainty—that members will be required to pay out-of-pocket for out-of-network services. For example, the Summary Program Description states that "[t]he reimbursement levels, as provided by the Schedule, *may* be less than the fee charged by the non-participating provider."

32.     GHI did not explain that the reimbursement rates were extraordinarily low when measured against other reimbursement methodologies typically used by PPOs—the most common of which is some portion of "reasonable and customary charges"—nor did it explain that members are virtually certain to incur substantial out-of-pocket expenses when using out-of-network providers.  GHI did not explain that the Schedule was a GHI-created spreadsheet that was not adjusted for inflation and that, out of thousands of procedures and services listed therein, only a tiny number had been adjusted.  GHI did not provide any accurate examples of how much the Schedule would reimburse for out-of-network services and what the member's financial responsibility would be. Indeed, the only coverage example was set forth in the SBC was as follows: "If an out-of-network provider charges more than the allowed amount, you may have to pay the difference. For example, if an out-of-network hospital charges $1,500 for an overnight stay and the allowed amount is $1,000, you may have to pay the $500 difference." GHI's decision to use a single example showing a 66% reimbursement when the average reimbursement was 23% was deceptive and misleading.

### (ii)     GHI's Promise of Catastrophic Coverage was Fraudulent

33.     The final section in GHI's one-page Summary Program Description is headed "Catastrophic Coverage" and states as follows: "**Catastrophic Coverage** – If you choose non-participating providers for predominantly in-hospital care and incur $1,500 or more in covered expenses you are eligible for additional 'Catastrophic Coverage.' Under this coverage, GHI pays 100% of the Catastrophic Allowed Charge as determined by GHI."

34.     "Catastrophic Allowed Charge" is not defined anywhere in the Summary Program Description or SBC but, according to GHI, "Catastrophic Allowed Charge" simply means the same thing as "Allowed Charge." So, according to GHI, it was merely promising to reimburse

the same amount that it had already agreed to reimburse regardless of whether the member had crossed the $1,500 threshold.

35.    This is exactly the type of deceptive conduct and false advertising that General Business Law § 349, General Business Law § 350, and Insurance Law § 4226 were designed to protect against. There was nothing "additional" about this coverage and it did not provide any protection against catastrophic situations. GHI deliberately used an undefined term to confuse NYC employees and retirees, induce them to select the GHI Plan, and cause them to incur substantial out-of-pocket costs that GHI led them to believe they were protected against.

### (iii)    GHI Misled Consumers regarding the Enhanced OON Rider

36.    During the Class Period, GHI offered prospective members an optional rider for an additional fee (the "Enhanced OON Rider").  The Enhanced OON Rider is described in two places in the Summary Program Description. After noting that reimbursement rates may in some cases be less than the fee charged, GHI states: "Please note that certain non-participating provider reimbursement levels may be increased if you have the optional rider."  Then, at the bottom of the Summary Program Description it states:

> ## Optional Rider (continued)
> • **Enhanced schedule for certain services increases the reimbursement of the basic program's non-participating provider fee schedule, on average, by 75%.**

37.    In fact, the Enhanced OON Rider applied only to in-patient out-of-network services, not out-patient services. The latter makes up the vast majority—65%--of out-of-

network costs, therefore depriving members of the benefit of the Enhanced OON Rider and unjustly enriching GHI.

38.     GHI collected roughly $25 million a year in revenues from the Enhanced OON Rider. After rebates to NYC, GHI earned over $3 million a year from the program.

**D.     The September 2014 Assurance of Discontinuance and Post-2014 Changes to Its Marketing Materials**

39.     On September 8, 2014, Attorney General Eric T. Schneiderman and GHI entered into an Assurance of Discontinuance relating to GHI's conduct.  The NYAG's investigation focused on four practices: (a) failure to make the Schedule available to members and prospective members; (b) failure to accurately describe limitations of out-of-network reimbursement and resulting financial consequences to members and prospective members; (c) misrepresenting the frequency with which the Schedule is updated, and (d) failure to sufficiently describe the circumstances by which members unknowingly encounter out-of-network providers.  The NYAG found these practices to constitute repeated violations of Executive Law § 63(12) and General Business Law §§ 349 and 350, imposed monetary penalties, and required GHI to make changes to both their marketing materials and business practices to render them non-deceptive.

40.     For example, GHI's Summary Program Description was changed as follows: (a) it now expressly states that reimbursement rates "are not related to usual and customary rates or to what the provider may charge but are set at a fixed amount based on GHI's 1983 reimbursement rates"; (b) GHI deleted statement that certain rates had been updated periodically and replaced it with a statement that "[m]ost of the reimbursement rates have not increased since that time"; (c) GHI deleted the statement that the reimbursement rates "may be less than the fee charged" and replaced it with a statement that reimbursement rates "will likely be less (and in many instances

much less) than the fee charged by the out-of-network provider"; (d) GHI added multiple examples of what members would typically pay out-of-pocket for out-of-network services, each showing very low reimbursement rates and substantial out-of-pocket costs; (e) GHI specified that the Enhanced OON Rider applies only to some surgical and in-hospital services; (f) GHI announced set forth new rules and procedures for surprise billings; and (g) GHI eliminated the deceptive description of Catastrophic Coverage.

## **CLASS ACTION ALLEGATIONS**

41. In 2014, Mr. Plavin's wife Dorothy received numerous medical services that GHI deemed out-of-network and consequently paid just a fraction of the expenses, saddling Mr. Plavin with responsibility for paying the difference despite having purchased the optional Rider and despite GHI's promise of Catastrophic Coverage. For example, in July 2014 a provider billed $512.66 for one of Mrs. Plavin's medical procedures. GHI allowed only $36 and ultimately paid just $21 after accounting for a $15 deductible. Also in July 2014, Mrs. Plavin received medical treatment for which the provider billed $98. GHI allowed only $47 and ultimately paid just $32 after accounting for a $15 deductible. For this particular treatment, GHI did not pay Mr. Plavin until February 2015. In March 2014, Mrs. Plavin received medical treatment for which the provider billed $1,840.85. GHI deemed the claim out-of-network and allowed only $150, ultimately paying just $135 after accounting for a $15 deductible. In February 2013, Mrs. Plavin received medical treatment for which the provider billed $6,000. GHI deemed the claim out-of-network and allowed only $350, ultimately paying just $335 after accounting for a $15 copay.

42. This action is brought by Plaintiff individually and on behalf of a class pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure. The class—referred to herein as the "CBP Class"—consists of:

> All persons who were members of Group Health Incorporated's Comprehensive Benefit Plan from 2011 to 2015 (excluding defendant GHI, its officers and directors, members of their immediate families, and the heirs, successors or assigns of any of the foregoing).

43. The CBP Class consists of hundreds of thousands of NYC workers and retirees and their families and is thus so numerous that joinder of all members is impracticable. The identities and addresses of class members can be readily ascertained from business records maintained by CBP.

44. The claims asserted by the Plaintiff are typical of the claims of the CBP Class.

45. The Plaintiff will fairly and adequately protect the interests of the Class and does not have any interests antagonistic to those of the other members of this class.

46. The Plaintiff has retained attorneys who are knowledgeable and experienced in life insurance matters, as well as class and complex litigation.

47. Plaintiff requests that the Court afford class members with notice and the right to opt-out of any class certified in this action.

48. This action is appropriate as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure because common questions of law and fact affecting the classes predominate over those questions affecting only individual members. Those common questions include:

    (a)    whether GHI's marketing materials and benefit descriptions were deceptive under General Business Law § 349 and materially misleading in violation of General Business Law § 350 and/or New York Insurance Law § 4226;

(b)      whether such violations were willful and knowing;

(c)      whether Plaintiff and Class members are entitled to receive actual damages as a result of the unlawful conduct by defendants alleged herein and the methodology for calculating those damages;

(d)      whether Plaintiff and Class members are entitled to receive statutory damages and/or penalties pursuant to General Business Law §§ 349 and 350 and whether trebling is appropriate;

(e)      whether Plaintiff and Class members conferred a benefit on GHI by enrolling in the GHI Plan;

(f)      whether Plaintiff and Class members conferred a benefit on GHI by paying for the Enhanced OON Rider; and

(g)      Whether equity and good conscience require restitution to Plaintiff and Class Members and/or the establishment of the constructive trust, and the amount of such restitution or constructive trust.

44.      A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

(a)      the complexity of issues involved in this action and the expense of litigating the claims, few, if any, class members could afford to seek legal redress individually for the wrongs that defendants committed against them, and absent class members have no substantial interest in individually controlling the prosecution of individual actions;

(b)      when GHI's liability has been adjudicated, claims of all class members can be determined by the Court;

(c)     this action will cause an orderly and expeditious administration of the class claims and foster economies of time, effort and expense, and ensure uniformity of decisions;

(d)     without a class action, many class members would continue to suffer injury while GHI retains the substantial proceeds of its wrongful conduct; and

(e)     this action does not present any undue difficulties that would impede its management by the Court as a class action.

## FIRST CLAIM FOR RELIEF

### Unjust Enrichment (on behalf of Plaintiff and the CBP Class)

49.     Plaintiff realleges and incorporates all allegations of this complaint as if fully set forth herein.

50.     Plaintiff and members of the CBP Class conferred a benefit upon GHI by enrolling in the GHI Plan and thereby directing their statutorily-entitled medical premiums to GHI.

51.     Plaintiff and members of the CBP Class conferred a benefit upon GHI by paying GHI for the Enhanced OON Rider.

52.     It would be inequitable for GHI to be permitted to retain the benefits obtained through its wrongful conduct.

53.     Plaintiff and members of the CBP Class are entitled to the establishment of a constructive trust impressed on the benefits to GHI from its unjust enrichment and inequitable conduct.

54.     Alternatively or additionally, GHI should pay restitution of its own unjust enrichment to Plaintiff and members of the CBP Class.

## SECOND CLAIM FOR RELIEF

## Deceptive Acts and Business Practices in Violation of General Business Law,

## Section 349 (on behalf of Plaintiff and the CBP Class)

55.     Plaintiff realleges and incorporates all allegations of this complaint as if fully set forth herein.

56.     New York General Business Law Section 349 imposes liability on anyone who engages in deceptive acts and practices in the conduct of any business, trade or commerce or in the furnishing of any service in New York.

57.     The unlawful acts and practices described herein were directed at consumers of health insurance and were therefore consumer-oriented.

58.     The acts and practices alleged herein were materially misleading as to, among other things, the out-of-network coverage provided by the GHI Plan, the rates of reimbursement for the GHI Plan, the availability of the Schedule, and the benefits of Catastrophic Coverage and the Enhanced OON Rider.

59.     Plaintiff and members of the CBP Class were injured as a result of GHO's deceptive acts and practices when they were denied the out-of-network coverage represented by GHI and became personally responsible for amounts due to medical providers.

60.     GHI intentionally and willingly violated New York General Business Law Section 349.

## THIRD CLAIM FOR RELIEF

## False Advertising in Violation of General Business Law, Section 350 (on behalf of Plaintiff and the CBP Class)

61.     Plaintiff realleges and incorporates all allegations of this complaint as if fully set forth herein.

62.     New York General Business Law Section 350 imposes liability on anyone who uses false advertising in the conduct of any business, trade or commerce or in the furnishing of any service in New York.

63.     The unlawful acts and practices described herein were directed at consumers of health insurance and were therefore consumer-oriented.

64.     The acts and practices alleged herein were materially misleading as to, among other things, the out-of-network coverage provided by the GHI Plan, the rates of reimbursement for the GHI Plan, the availability of the Schedule, and the benefits of Catastrophic Coverage and the Enhanced OON Rider.

65.     Plaintiff and members of the CBP Class were injured as a result of GHO's deceptive acts and practices when they used out-of-network providers and were not provided the coverage represented by GHI.

66.     GHI intentionally and willingly violated New York General Business Law Section 350.

## FOURTH CLAIM FOR RELIEF

## Misrepresentation in Violation of New York Insurance Law, Section 4226 (on behalf of Plaintiff and the CBP Class)

67.     New York Insurance Law § 4226(a) imposes liability on any insurer authorized by the State of New York that issues or circulates any illustration, circular, statement, or memorandum misrepresenting the terms, benefits, or advantages of any of its insurance policies.

68.     GHI issued statements and memorandum that materially misrepresented the out-of-network coverage provided by the GHI Plan, the rates of reimbursement for the GHI Plan, the availability of the Schedule, and the benefits of Catastrophic Coverage and the Enhanced OON Rider in violation of New York Insurance Law § 4226(a)

69.     These violations of New York Insurance Law § 4226(a) were knowing and/or GHI knowingly received premiums and other compensation in consequence of such violation.

70.     Plaintiff and members of the CBP Class have paid premiums for life insurance policies sold by an insurer authorized by the State of New York that nonetheless failed to comply with New York law governing representations made by such an authorized insurer. Plaintiff is therefore a person aggrieved under the statute as a result of GHI's misrepresentations.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

1.      Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

2.      Awarding Plaintiff and the CBP Class compensatory damages, restitution, disgorgement, and any other relief permitted by law or equity pursuant to the First, Second, Third, and Fourth Claims for Relief;

3.      To the extent statutory damages exceed actual damages, awarding statutory damages pursuant to the Second and Third Claims for Relief;

4.      Awarding treble damages pursuant to Second and Third Claims for Relief;

5.      Awarding a penalty in the amount of all premiums paid to GHI for the insurance that was in effect during the Class Period;

6.      Awarding Plaintiff and the class pre-judgment and post-judgment interest, as well as costs;

7.      Awarding reasonable attorneys' fees and costs pursuant to the Second and Third Claims for Relief;

8.      Awarding Plaintiff and the class such other relief as this Court may deem just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury as to all issues so triable.


Dated: August 16, 2017

<div style="margin-left:50%">

/s/ Bill Carmody

Bill Carmody *(Pro Hac Vice to be submitted)*
Arun Subramanian *(Pro Hac Vice to be submitted)*
SUSMAN GODFREY LLP
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019-6023
Tel.: 212-336-8330
Fax: 212-336-8340
bcarmody@susmangodfrey.com
asubramanian@susmangodfrey.com

/s/J. Timothy Hinton, Jr., Esq.

J. Timothy Hinton, Jr., Esq. (PA ID 61981)
Michael F. Cosgrove, Esq. (PA ID 47349)
HAGGERTY HINTON & COSGROVE
LLP
203 Franklin Avenue
Scranton, PA 18503
Tel: (570) 344-9845
timhinton@haggertylaw.net
mikecosgrove@haggertylaw.net

*Attorneys for Plaintiff and the Class*

</div>